UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

BRIAN RUBEL,

           Defendant.

09 Cr. 898 (CS)

## Government's Memorandum of Law Opposing Early Termination of Supervised Release

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Michael D. Maimin
Assistant United States Attorney
- Of Counsel -

## Table of Contents

I.    Preliminary Statement ........................................................................................... 1

II.   Background ............................................................................................................. 1

      A.   Offense Conduct ........................................................................................ 1

      B.   Indictment and Original Sentence ............................................................ 2

      C.   Rubel's Violations of the Terms of His Supervised Release .................... 3

      D.   Rubel's *Anders* Brief, the Second Circuit's Remand, and Rubel's
           Resentencing ............................................................................................. 6

      E.   Rubel's Appeal of His Sentence ............................................................. 10

      F.   Rubel's Adjustment to His Latest Term of Supervised Release ............ 12

III.  Argument ............................................................................................................. 13

      A.   Applicable Law ....................................................................................... 13

      B.   Discussion ............................................................................................... 18

IV.   Conclusion .......................................................................................................... 23

## I.      Preliminary Statement

This Court has decided three times now that Brian Rubel—a serious sex offender—merited a lifetime term of supervised release, both when it originally sentenced him in 2010, when it sentenced him for violating the conditions of his supervised release in several troubling ways in 2016, and when is resentenced him for those violations in 2018. Rubel now asks this Court to terminate his term of supervised release, telling the Court that he has done well this time around, that he would like to visit extended family out of state without permission, and that he would like a new job. Given Rubel's history—including violations of supervised release in the past as well as attempts to hide his activities—this Court should not terminate his term of supervised release early.[1]

## II.     Background

Given the nature of Rubel's offense and procedural history—and how that offense and procedural history informs this Court's decision today—it makes sense to discuss them.

### A.      Offense Conduct

In 2008 and 2009, Rubel downloaded videos and pictures from the internet showing minors engaged in sexual conduct, often using "incest" as a search term to find files. (PSR ¶¶ 7(a) & (b), 11). Videos of child pornography—including sex involving prepubescent children—that he maintained on his own computers included

---

[1] The Court granted an extension to the Government, on consent, to today to respond to Rubel's request for early termination.

such filenames as "XXX—Incent-5yo raped, hymen penetrated-kiddy little girl young porn real child sex baby pedo," "T-28313051-pedo—11 year old kids having sex.mpg," and "10 yo KAJR@YGOLD BABY RAPE—PLEASE SHARE!!! Clip.mpg." (PSR ¶ 10(a), (d), & (e)).

Rubel did not adjust well to pre-trial supervision. Among other things, he was unfavorably discharged from two different residential treatment providers: in one, he refused to follow the program's rules; and in the other he ultimately engaged in oral sex and unprotected intercourse with a female patient with "a borderline IQ." (PSR ¶ 45).

### B.    Indictment and Original Sentence

On September 22, 2009, a grand jury in this District returned the Indictment, charging Rubel with receiving and distributing child pornography (Count One), and possession of child pornography (Count Two). Rubel pleaded guilty to possession of child pornography (Count Two) on November 19, 2010. The Probation Office recommended a Guidelines supervised release term of life. (PSR ¶ 69 & at 21; United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") §§ 5D1.2(b), (c)). Rubel did not object to that portion of the sentence in his sentencing memorandum. (11/15/10 Def. Sent. Letter 1–3). To the contrary, Rubel asserted that "[i]t is very difficult to accurately predict what [his] life might look like in several years," and so simply argued that he "has spent enough time in jail." (11/15/10 Def. Sent. Letter 3). Nor did he object to lifetime supervised release at sentencing; he simply advocated for "many

years['] probation with strict conditions and serious treatment." (11/19/10 Sent. Tr. 11).

After reviewing all the submissions and listening to the parties, this Court sentenced Rubel principally to a term of 66 months' imprisonment, followed by a life term of supervised release, explaining, at length, the reasons it believed lifetime supervised release was appropriate. (11/19/10 Sent. Tr. 26–27).[2] Among the terms of supervised release, this Court required Rubel to both "undergo a sex-offense-specific evaluation and participate in a sex offender treatment and/or mental health treatment program" and "participate in the Computer/Internet Monitoring program administered by the U.S. Probation Office." (11/19/10 Sent. Tr. 29–31; Docket Entry 18 at 4).

Rubel did not appeal his sentence.

## C.    Rubel's Violations of the Terms of His Supervised Release

On August 5, 2015, Rubel was released from custody and placed under supervised release. (Violation Report at 2). On September 8, 2016, the Probation Office sent this Court a Request for Summons—which summons this Court issued— setting forth four specified violations of supervised release charged by the Probation Office. The Probation Office noted that "Rubel … made an extremely poor adjustment to supervised release." (*Id.*). The Probation Office explained that, first, Rubel had not

---

[2] This Court also noted that the "probation office always has the option of, at the point they feel it's no longer necessary, reducing the level of supervision or even terminating it." (11/19/10 Sent. Tr. 27).

complied with his court-ordered sex-offender treatment and was belligerent toward the treatment provider. (*Id.* at 3-4). Second, Rubel had had contact with a child under the age of 18—specifically the seven-year-old daughter of his friend—at least a dozen times, despite having been specifically denied permission to do so. (*Id.* at 4–5). Third, Rubel had loitered within 100 feet of a park primarily used by children, for which a New York City Police Department Officer had issued him a summons. (*Id.* at 6). Fourth, Rubel had not provided truthful information to his Probation Officer about his use of a Facebook account. (*Id.*). In particular, despite being instructed not to use Facebook, Rubel accessed Facebook over 70 times, using unmonitored, unreported computers.[3] (*Id.*).

In addition to the specified violations, the Probation Office reported more troubling behavior and statements. Among other things: (1) while at a halfway house, before his formal release, Rubel was seen kissing a young female, who he said was 19 years old, but refused to produce identification, stating that "it's nobody's business who he is dating";[4] (2) Rubel admitted that, when he was 19 years old, he had sex with a 16-year-old; (3) Rubel told a therapist that "there's nothing wrong with a 12 or 13 year old having sex with an older person, it's just our society that makes it wrong"; (4) Rubel engaged in aggressive and belligerent behavior with his therapist, including

---

[3] Rubel did not challenge the instruction not to use Facebook.

[4] When Rubel later reported to the Probation Office, he brought his girlfriend who showed identification stating that she was, in fact, 19 years old. (Violation Report at 2).

repeated references to "slitting" other people's "throats;" and (5) Rubel lied repeatedly to his Probation Officer both about his sexual relationships with others, and about the fact that he had had repeated contact with a minor despite not being allowed to do so. (*Id.* at 3–5).

On September 14, 2016, Rubel appeared before this Court, and admitted all four specified violations. (9/14/16 VOSR Tr. 1–35). This Court heard the parties that same day about sentencing. Rubel did not directly address the length of any term of supervised release; rather, he indicated that he understood that a new term of supervised release would be imposed to follow any term of imprisonment (9/14/16 VOSR Tr. 18 ("How many days, how many months should Brian sit in jail for the wake-up call that when he comes out this time, if he continues this pattern, he's going back in for a longer period of time?")), and that he has a "severe, extended, lifetime, emotionally crippling illness" (*id.*).

This Court then sentenced Rubel principally to 12 months' imprisonment, to be followed by the same life term of supervised release, with the same standard and special conditions that it had imposed at Rubel's original sentencing, including the sex offender treatment condition and the computer monitoring condition, explaining her reasons in detail. (9/14/16 VOSR Tr. 21–30). Specifically, this Court found Rubel's violations to be "serious," "troubling," and "alarming," and noted that his actions and statements undermined his purported remorse that he expressed at his initial sentencing. (9/14/16 VOSR Tr. 22). This Court found Rubel to be manipulative and untrustworthy and to have "dangerous ideas" from which the public required

protection. (9/14/16 VOSR Tr. 22–24). This Court concluded that it had "zero confidence that Mr. Rubel, given the opportunity, would refrain from either repeating the offense of conviction or doing something worse." (9/14/16 VOSR Tr. 24–25).

Rubel did not object to the lifetime term of supervised release.

### D.    Rubel's *Anders* Brief, the Second Circuit's Remand, and Rubel's Resentencing

Rubel timely appealed. His appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), stating that, after reviewing the record, counsel had concluded that there were no meritorious or non-frivolous issues to be raised on appeal, and moved to be relieved as counsel. The Government agreed and moved for summary affirmance. The Second Circuit denied the motions, ordering the parties to:

> address whether [Rubel]'s special supervised release condition requiring his participation in the "Computer/ Internet Monitoring program" prohibits him from gaining access to social media or the internet and, if so, whether the prohibition involves a greater deprivation of liberty than is reasonably necessary for the purposes of sentencing.

With the Government's consent, Rubel moved for remand "for further proceedings concerning" the Computer Monitoring Condition, explaining that:

> the record fails to provide the information necessary to respond to the Court's question. It does not provide a reason for the special condition of Rubel's participation in Probation's "Computer/Internet Monitoring Program." Nor does it provide any information to the scope of the program or how it is to be implemented.

Accordingly, the Second Circuit remanded the case, ordering:

> On remand, the parties and the Probation Office shall supplement the record and the district court shall clarify

whether the "Computer/Internet Monitoring program" condition prohibits [Rubel] from accessing social media or the internet or both. If it does include such a prohibition, the parties shall brief, for the district court's consideration, and the district court shall determine, whether the prohibition "involves no greater deprivation of liberty than is reasonably necessary." *See United States v. Dupes*, 513 F.3d 338, 343-44 (2d Cir. 2008) (internal quotation marks omitted). If the district court decides to retain all or part of the "Computer/Internet Monitoring program" condition or to modify the condition, it should explain its reasoning so as to permit appellate review. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1736–38 (2017); *United States v. Johnson*, 446 F.3d 272, 281–83 (2d Cir. 2006); *United States v. Sofsky*, 287 F.3d 122, 126–27 (2d Cir. 2002).

On November 13, 2017, this Court held a conference to address this Court's remand order. At that time, this Court noted that *Packingham* dealt with North Carolina's prohibition—applicable to sex offenders—on the use of social media, and compared that to the "description of the Computer/Internet Monitoring program, [which] just allows Probation to monitor." (11/13/17 Conf. Tr. 6). The Probation Officer responded that, "[a]ccording to the wording of the condition and our contract that we have clients sign, social media use is not necessarily prohibited. Through the contract use, we do require prior approval from our office before they access various social media sites." (*Id.*). This court indicated its concern about the Probation Office's authority to impose that restriction on a supervisee. (*Id.*).

In particular, this Court noted that it was "concerned if in fact there is a possibility of some sort of blanket prohibition on social media," because "[i]t's one thing to say … 'you can't go on the site of … a group that thinks it's okay to have sex with children,' it's another thing to say, 'you can't be on the Internet at all,' or … 'you

7

can't be on Facebook at all.'" (11/13/17 Conf. Tr. 8). This Court explained that "there's two sort of levels of concern here: One is, you know, where the authority comes from to restrict it, and then the other is, on the facts of a particular case, is there a basis to restrict it, and[,] if there is, whose call that is." (11/13/17 Conf. Tr. 10). This Court went on to note that, when it imposed the condition, it intended to impose a monitoring condition, not a restriction on access to the Internet or Facebook. (11/13/17 Conf. Tr. 10–11). While a blanket or more tailored restriction could be appropriate—for example, to prevent relapses or to protect the public—such restrictions would have to be justified and the Court would have to make appropriate factual findings. (11/13/17 Conf. Tr. 11). The Court thereafter asked the parties to address whether any restrictions had to be specified by the District Court or whether the Probation Office could be given the discretion to specify such restrictions, and, in either case, what individualized findings had to be made. (*Id.*). As a practical consideration, the Court observed "it's going to be pretty hard for judges to … make site-by-site or social media platform by social media platform decisions about what a given defendant should or should not be looking at." (11/13/17 Conf. Tr. 12).

After significant discussion among the parties and the Probation Office, and multiple submissions to, and arguments before, the Court, the Court imposed a new sentence.

The parties appeared before the Court on August 17, 2018, so that it could amend Rubel's terms of supervised release. At that proceeding, Rubel raised concerns that, of the Government's proposed categories of websites for which Rubel would have

8

to check with his probation officer before accessing the website for the first time, the categories "downloads," "download media" and "webmail" were too broad. (8/11/18 Sent. Tr. 2–4). But, after this Court and the Government explained that Rubel would simply have to notify the Probation Office once so the Probation Officer could confirm that the website (or application) did not run afoul of the terms of supervised release —for example, that a mail server could be monitored or a media download site such as iTunes did not offer otherwise-prohibited materials—and then Rubel could use that website freely (8/11/18 Sent. Tr. 4–6), Rubel did not further object (8/11/18 Sent. Tr. 7 ("I understand what the government is saying ….")). Rubel also argued that the monitoring condition was overbroad, and that the Probation Office had excessive discretion to block certain applications. (8/11/18 Sent. Tr. 7–11). This Court ultimately explained that the Probation Office did not have the discretion to block any applications that were not otherwise prohibited by the terms of supervised release (8/11/18 Sent. Tr. 11), and that monitoring was necessary in light of Rubel's history (8/11/18 Sent. Tr. 16–17). Accordingly, this Court, explaining its reasons in detail, withdrew the prior treatment and computer/internet monitoring conditions, and replaced them with the seven conditions that the Government had proposed— four of which had drawn no objections—including the "specif[ied] categories of websites that are off limits or need pre-approval" that Rubel had requested and the Government had proposed. (8/11/18 Sent. Tr. 11–24; 8/28/18 J&C 6–7). In connection with the pre-approval condition, the Court required the Probation Officer to approve

9

Rubel's use of websites or applications unless otherwise barred within three business days. (8/11/18 Sent. Tr. 22.).

The Court also noted that it "d[id]n't know if this has to be a full resentencing," and therefore, out of an abundance of caution, stated that, "to the extent it does," she was resentencing him as she had sentenced him previously, but with the amended provisions; *i.e.*, it re-imposed a lifetime term of supervised release. (8/11/18 Sent. Tr. 24).

### E.    Rubel's Appeal of His Sentence

Rubel appealed his sentence, arguing both that the lifetime term of supervised release was substantively unreasonable and that four of the special conditions that this Court imposed—the monitoring condition, the access condition, the treatment provider condition, and the social media condition—were inappropriate. The Second Circuit affirmed the sentence in a summary order. *United States v. Rubel*, 823 F. App'x 1 (2d Cir. 2020). Relevant here, with respect to the lifetime term of supervised release, the Second Circuit explained:

> Rubel's primary contention is that the District Court "never adequately explained why a lifetime term of supervised release is warranted." … But the court provided ample reasons for the sentence it imposed, including that Rubel presents "a high risk of recidivism and danger to the community." …. We therefore have little difficulty concluding that the District Court did not commit procedural error—plain or otherwise—in sentencing Rubel.
>
> Nor do we find the sentence imposed to be substantively unreasonable. Indeed, as we noted, not only does a lifetime term of supervised release lie within the recommended Guidelines range for defendants like Rubel,

the Guidelines expressly suggest that courts impose such a term in cases like this one, where the "offense of conviction is a sex offense." … Although we will not "presume that a Guidelines sentence is reasonable, we have recognized that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." … We have reasoned along these lines in affirming the imposition of lifetime terms of supervised release in cases involving misconduct that closely parallels Rubel's, such as simple possession or receipt of child pornography. *See, e.g., United States v. Brown*, 360 F. App'x 189, 190–92 (2d Cir. 2010) (restating Congress's finding "that the high rate of recidivism of sex offenders does not decline with age" as support for the conclusion that a lifetime term of supervised release was substantively reasonable where the defendant had been convicted of possession of child pornography); *United States v. Raftopoulos*, 254 F. App'x 829, 830–31 (2d Cir. 2007) (finding "that the district court's imposition of lifetime supervised release was reasonable" where the defendant had been convicted of receiving child pornography and "[m]oreover," the record contained evidence of the defendant's "ideation" about unlawful sexual activities, including "fantasizing about having sex with [minors]"). Thus, given the nature of Rubel's crime; his violation of both the terms of his bail and, later, of the conditions of his supervised release; and the District Court's findings with respect to his personal characteristics, we cannot say that this component of Rubel's sentence is "shockingly high … or otherwise unsupportable as a matter of law." … We therefore conclude that the District Court did not abuse its discretion in imposing a lifetime term of supervised release.

*Id.* at 4–5. The Second Circuit noted, as this Court had, "that Rubel may, in the future (and presumably after a period of time in which he has been in compliance with the applicable conditions), apply to the District Court to terminate his supervised release." *Id.* at 5 n.4.

### F.    Rubel's Adjustment to His Latest Term of Supervised Release

Despite telling this Court that he has "excelled during the past seven years of supervision" (Docket Entry 51 at 2), and that, "[u]pon revocation, Mr. Rubel realized he had to put forth full effort on supervision or he would be spending the next several years in prison" (Docket Entry 51 at 3), Rubel has had problems with supervision, as this Court is aware from a status report filed with the Court on November 16, 2021. In particular, Rubel was released to supervision on September 13, 2017. As this Court knows, Rubel needs to stay away from the so-called "BDSM" lifestyle. (Status Report 3).[5] And yet, on July 13, 2021, the Probation Office searched Rubel's "new residence," and found "a pair of bondage stocks for hands and feet." (Status Report 3). Rubel told the Probation Office that they were "old stocks and he no longer used them." (Status Report 3). Not only is this difficult to believe on its face, but it is impossible to believe given that this was a "new residence." (Status Report 3). Not surprisingly, on July 27, 2021, CrimeStoppers received an anonymous tip that Rubel was actively engaged in the BDSM community, specifically "Bedlam" events. (Status Report 3). While Probation told this Court that it was unable to corroborate that tip, it fits in perfectly with Rubel keeping stocks at his new home.

Additionally, the reason that Rubel is currently in therapy with Dr. Berrill is that he was unable to progress with a different therapist. (Status Report 3). Indeed,

---

[5] The Probation Office erroneously states that "BDSM" stands for "Bondage and Discipline, Dominance and Submission." (Status Report 3). It actually stands for "bondage, discipline, sadism, and masochism." https://www.merriam-webster.com/dictionary/BDSM.

the Probation Office reports that "a note from February 12, 2020 indicates his lack of compliance with his treatment appointments and minimizing his need for medication were interpreted as attempts at manipulation and resulted in the denial of Rubel's request to travel to Vermont for a ski trip."

Finally, Rubel continued to use secret unmonitored devices. The Probation Office notes that, in March 2020, "2 unmonitored devices were confiscated from his residence and that he admitted to having another unmonitored device without permission at that time (a laptop for a period of apx a week)." This is, of course, consistent with the 2021 anonymous tipster's allegation that Rubel "has a secondary cellphone that is unmonitored" (Status Report 3), even if the Probation Office was unable to find it.

## III. Argument

While Rubel should be proud of the accomplishments his attorney lists in her letter to the Court, they simply do not counsel for early termination of supervised release. If anything, if accurate,[6] these accomplishments show that supervised release is working for Rubel, and should not be abandoned now.

### A. Applicable Law

This Court may "terminate a term of supervised release … at any time after the expiration of one year of supervised release … if it is satisfied that such action is

---

[6] Given Rubel's prior attempts to hide evidence of his violations, it would not be unreasonable for this Court to take Rubel's assertions of compliance with a grain of salt.

warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). "Occasionally, changed circumstances—for instance, exceptionally good behavior by the defendant or a downward turn in the defendant's ability to pay a fine or restitution imposed as conditions of release—will render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a)." *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997). In deciding whether to terminate supervised release early, this Court is required to consider:

- "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1);

- "the need for the sentence imposed … to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B);

- "the need for the sentence imposed … to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C);

- "the need for the sentence imposed … to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D);

- "the kinds of sentence and the sentencing range established," as set forth in the Sentencing Guidelines, 18 U.S.C. § 3553(a)(4);

- "any pertinent policy statement" issued by the Sentencing Commission, 18 U.S.C. § 3553(a)(5); and

- "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

18 U.S.C. § 3583(e)(1) (explaining that a court may terminate a term of supervised release only "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)").[7]

Additionally, the current Guide to Judiciary Policy sets forth a presumption (though not a requirement):

> At 18 months, there is a presumption in favor of recommending early termination for persons who meet the following criteria:
>
> (1)    The person does not meet the criteria of a career drug offender or career criminal (as described in 28 U.S.C. § 994(h)) or has not committed a sex offense or engaged in terrorism;
>
> (2)    The person presents no identified risk of harm to the public or victims;
>
> (3)    The person is free from any court-reported violations over a 12-month period;
>
> (4)    The person demonstrates the ability to lawfully self-manage beyond the period of supervision;
>
> (5)    The person is in substantial compliance with all conditions of supervision; and
>
> (6)    The person engages in appropriate prosocial activities and receives sufficient prosocial support to remain lawful well beyond the period of supervision.

Guide to Judiciary Policy, Volume 8, Part E, Chapter 3, § 360.20(c). This presumption, notably, does not consider the statutory factors;[8] while the current

---

[7] 18 U.S.C. § 3553(a)(7) discusses the need to pay restitution. Because no restitution was ordered here, this factor is irrelevant.

[8] Needless to say, the statutory factors trump any internal policy statements.

Guide to Judiciary Policy does not contain any reference to what factors a Court or

Probation Officer should take into account in determining whether the presumption

is rebutted or supervised release should otherwise be terminated, a prior version did,

and those factors are illuminating:

> Officers should consider the suitability of early termination for offenders as soon as they are statutorily eligible. The general criteria for assessing whether a statutorily eligible offender should be recommended to the court as an appropriate candidate for early termination are as follows:
>
> (1)    Stable community reintegration (e.g., residence, family, employment);
>
> (2)    Progressive strides toward supervision objectives and in compliance with all conditions of supervision;
>
> (3)    No aggravated role in the offense of conviction, particularly large drug or fraud offenses;
>
> (4)    No history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence);
>
> (5)    No recent arrests or convictions (including unresolved pending charges) or ongoing, uninterrupted patterns of criminal conduct;
>
> (6)    No recent evidence of alcohol or drug abuse;
>
> (7)    No recent psychiatric episodes;
>
> (8)    No identifiable risk to the safety of any identifiable victim; and
>
> (9)    No identifiable risk to public safety based on the Risk Prediction Index.

Monograph 109, Guide to Judiciary Policy, Volume 8, Part E, Chapter 3, § 380.10(b). [9]

As recently as 2020, the Probation Office used these nine factors to discuss whether a defendant merited early termination of supervised release. *See United States v. Kassim*, No. 15 Cr. 554 (KPF), 2020 WL 2614760, at *1 n.1 (S.D.N.Y. May 22, 2020) ("The Probation Department concurred with the defense in a sealed memorandum dated May 15, 2020. Among other things, it cited an internal monograph, the Guide to Judiciary Policy, which outlines nine criteria for probation officers to consider in determining whether to recommend early termination: (i) stable community reintegration (e.g., residence, family, employment); (ii) progressive strides toward supervision objectives and in compliance with all conditions of supervision; (iii) no aggravated role in the offense of conviction, particularly large drug or fraud offenses; (iv) no history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence); (v) no recent arrests or convictions (including unresolved pending charges) or ongoing, uninterrupted patterns of criminal conduct; (vi) no recent evidence of alcohol or drug abuse; (vii) no recent psychiatric episodes; (viii) no identifiable risk to the safety of any identifiable victim; and (ix) no identifiable risk to public safety based on the Risk Prediction Index.").

Moreover, "[a] defendant's faithful compliance with the terms of his supervision does not, by itself, entitle him to modification or termination of his term of supervised release." *United States v. Bouchareb*, 76 F. Supp. 3d 478, 479 (S.D.N.Y.

---

[9] A copy of "Monograph 109," which is the earlier version of the policy, is available at http://www.madisonattorney.com/cjablog/Monograph109.pdf.

2014) (Marrero, *J.*). That is because "full compliance with the terms of supervised release is what is expected … and does not warrant early termination." *Id.*; *see also United States v. Gonzales*, No. 94 Cr. 134 (JSR), 2015 WL 4940607, at *1 (S.D.N.Y. Aug. 3, 2015) (Rakoff, *J.*) ("[F]ull compliance with the terms of supervised release is what is expected of [the defendant] … and does not warrant early termination." (internal quotation marks omitted)); *United States v. Medina*, 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998) (Sweet, *J.*) ("While [the defendant's] post-incarceration conduct is apparently unblemished, this alone cannot be sufficient reason to terminate the supervised release since, if it were, the exception would swallow the rule."). Instead, as numerous courts have recognized, "[c]ourts do not order early termination of supervised release as a matter of course. Rather, such relief may occasionally be justified by new or unforeseen circumstances, such as when exceptionally good behavior by the defendant renders a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a). Exceptionally good behavior is not established by mere compliance with the terms of supervised release, which is what is expected … and does not warrant early termination." *United States v. Stein*, No. 09 Cr. 377 (RPK), 2020 WL 4059472, at *2 (E.D.N.Y. July 19, 2020) (Kovner, *J.*) (citations omitted).

## B.    Discussion

It is entirely clear that merely complying with the conditions of release, maintaining a stable residence, not getting arrested, and attending therapy–as the Court expected him to do—are not even close enough to merit early termination of

18

supervised release, especially when placed against the background of an egregious offense that puts children at risk, coupled with repeated violations of the terms of bail and of supervision in the past. It is not surprising that, other than a very plain-vanilla description of Rubel's history ("one count of child pornography possession" and violations involving "failure to participate in sex offender treatment and unreported contact with a minor" (Docket Entry 51 at 1)), Rubel fails to discuss, much less confront, his lengthy pattern of unchecked conduct, even in the face of incarceration, and why that militates for supervised release.

Moreover, Rubel's compliance has been spotty, and indicates a likelihood that he has simply gotten better at covering his tracks. In March 2020, the Probation Office seized two unmonitored devices from Rubel, and Rubel admitted that he had another one. This, of course, was part of the basis of his initial violations. And it is consistent with an anonymous tip that, the following year, Rubel again had a secret, unmonitored cellphone; this time, Rubel learned to hide it well enough that the Probation Office could not find it. That tipster also said that Rubel had reinserted himself in the BDSM community at the same time that he brought BDSM stocks into his "new residence," and wove an unbelievable story that, somehow, he had forgotten about the stocks that made their way into his new home.

Even if Rubel were to be believed, and, since 2021, he has actually been compliant, all he would have done "is what is expected … and does not warrant early termination." *Bouchareb*, 76 F. Supp. 3d at 479. To the contrary, the applicable

19

statutory factors—which this Court must consider—counsel overwhelmingly against early termination:

- *[T]he nature and circumstances of the offense and the history and characteristics of the defendant.* Rubel committed serious crimes that indicate predilections that would put children at serious risk. He showed some of the nature of that risk when, while on bail, he engaged in oral sex and unprotected intercourse with a female patient at his residential treatment who had a "borderline IQ," and then, while on supervised release, he failed to comply with treatment and was belligerent toward his provider, had contact at least a dozen times with a seven-year-old girl, despite having been specifically denied permission to do so, loitered within 100 feet of a playground, lied about his use of Facebook (which use was wholly unmonitored and so the Court still has no idea what he was doing that he felt the need to conceal), he was kissing a girl who was likely underage, and he told a therapist that there was nothing wrong with children having sex with adults.

- *[T]he need for the sentence imposed … to afford adequate deterrence to criminal conduct.* The sentence this Court imposed was critical to afford adequate deterrence; Rubel showed himself to be unrelenting, with his continuous violations of both bail and supervised release. Indeed, if anything, his report that, following his term of incarceration for violating supervised release, Rubel finally understood he could no longer violate the rules shows the absolute need for continued supervised release.

- *[T]he need for the sentence imposed … to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.* Even Rubel tells the Court how important and effective his sex-offender treatment is. (Docket Entry 51 at 3). Supervised release is an important factor in his continued treatment. As for vocational training, Rubel tells the Court that he is doing well as his job (*id.*), but he would like a new job (*id.* at 4). However, he does not explain why termination of supervision would allow him to get a new job, or how supervision prevents him from seeking better employment. If anything, this Court knows that the Probation Officers are extremely good at helping supervisees obtain and maintain fruitful employment.

- *[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar*

20

*conduct.* Rubel offers no evidence that defendants like him regularly have their supervised release terminated early.

Rubel offers this Court two real reasons to terminate his supervised release early; neither holds up to even brief examination.[10] First, Rubel tells the Court that "[t]ermination of supervision will permit Mr. Rubel to visit extended family in New Jersey, Arizona, and California without Court permission." (Docket Entry 51 at 4). That may be so, but it means little. Putting aside that Rubel does not explain why he needs to visit his extended family—this "factor" would apply to nearly anybody—he does not tell this Court why it is such an imposition to have to clear such travel with his Probation Office. Second, Rubel tells this Court that "he would like to find a new job that does not require standing on his feet all day." (*Id.*). Everybody would like a better job. It is unclear how Rubel's supervision, however, stands in the way of his seeking a new job; indeed, the Probation Office has resources to help supervisees obtain employment, and there is no reason Rubel cannot take advantage of that.

Finally, Rubel says something chilling: he "is fully aware that he may need to return to therapy at some point in the future. He is committed to doing so as needed, but feels stable now." (Docket Entry 51 at 4). This is very troubling. Rubel's problems are endemic. He is now telling this Court that he should be trusted with his own treatment. He has proved otherwise over and over. He desperately needs the

---

[10] While he does not offer it as a reason, Rubel tells this Court that he has an adult girlfriend. (Docket Entry 51 at 3). That is a good thing. However, not only is it not a reason for early termination, but Rubel forthrightly admits that it may not last: "He is carefully considering how, if at all, to continue the relationship." (*Id.*).

21

structure of supervision—as well as the therapy that comes with it—to continue his reintegration into society.

In short, Rubel has not demonstrated any exceptional or changed circumstances that render the remaining period of supervision "either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a)." *Lussier*, 104 F.3d at 36. Rather, even if he is to be believed, he has done no more than this Court entrusted him to do. As Chief Judge Swain explained in the course of denying a motion for early termination of supervised release in another case:

> While the Court commends [the defendant] for his substantial compliance with the terms of his supervised release, and for making positive contributions to his community, the Court finds that [the defendant] has not identified extraordinary conduct or unforeseen harsh circumstances that warrant early termination of his supervised release. Even though [the defendant's] post-incarceration conduct is unblemished, this alone cannot be sufficient reason to terminate the supervised release. After all, full compliance with the terms of supervised release is what is expected of him and all others serving terms of imprisonment and supervised release and does not warrant early termination."

*United States v. Sweat*, No. 16 Cr. 269 (LTS) (S.D.N.Y.), Docket Entry 9 at 2–3 (Feb. 4, 2020) (Swain, *C.J.*) (internal quotation marks and citations omitted). The same holds true in this case. Indeed, if mere compliance with the terms of supervised release were enough to merit early termination—irrespective of the nature and circumstances of the offense—supervision would be granted in many, if not most, cases.

22

## IV.    Conclusion

This Court should deny Rubel's motion for early termination of his term of supervised release.

Dated:    New York, New York
    November 11, 2024

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney
          for the Southern District of New York

By:    _____
          Michael D. Maimin
          Assistant United States Attorney
          Tel.: (212) 637-2340